56 F.3d 60
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 CHESTNUT FORKS TENNIS CLUB, Plaintiff-Appellant,
v.
T.J. INTERNATIONAL, INCORPORATED; Trus Joist MacMillan,
Limited, Defendants-Appellees.
 No. 94-1315.
 United States Court of Appeals, Fourth Circuit.
 Argued Jan. 31, 1995.
Decided May 31, 1995.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, District Judge. (CA-93-977-A)
 E.D.Va.
 REVERSED.
 ARGUED: Christopher Andrew Myers, Holland & Knight, Washington, DC, for appellant. Thomas Bruce Newell, Watt, Tieder & Hoffar, McLean, VA, for appellees. ON BRIEF: Gina Schaar Howard, Holland & Knight, Washington, DC, for appellant. Richard G. Mann, Jr., Charlie C.H. Lee, Watt, Tieder & Hoffar, McLean, VA, for appellees.
 Before HALL and WILKINSON, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Chestnut Forks Tennis Club appeals an order granting summary judgment to defendants T.J. International, Inc., and Trus Joist MacMillan, Ltd.,[1] in Chestnut Forks' action for breach of an express warranty of future performance of wooden roof trusses installed at an indoor tennis complex. Because we conclude that summary judgment was inappropriate, we reverse and remand for trial.
 
 I.
 
 2
 Chestnut Forks Tennis Club is an indoor tennis complex in Warrenton, Virginia. It was constructed in 1974-1975, with a roof truss system manufactured by defendant Trus Joist. Chestnut Forks is a Virginia partnership; John Maloney is its general partner.
 
 
 3
 The trusses were made of yellow pine and, at the instance of Chestnut Forks' insurers, were treated with a fire retardant by Koppers Company, Inc. (now Beazer East, Inc.). This retardant caused the pine to crack and weaken much sooner than anyone expected. In 1992, Trus Joist, having apparently discovered the retardant's deteriorating effects elsewhere, sent engineers to Chestnut Forks to inspect the truss system. The engineers found that the system was dangerously weakened, and Chestnut Forks spent over $400,000 to replace it. Trus Joist refused to pay for the replacement.
 
 
 4
 On July 26, 1993, Chestnut Forks filed suit in district court against Trus Joist and Beazer East, Inc. Jurisdiction rested on diversity of citizenship. It pled several claims--breach of various express and implied warranties and negligent design and manufacture. The defendants moved to dismiss based on Virginia's statute of limitations. Va.Code Sec. 8.2-725(1). The district court granted the motion, but gave Chestnut Forks fifteen days to file an amended complaint.
 
 
 5
 The amended complaint, filed October 4, 1993, asserted a single claim against Trus Joist--breach of an express warranty of future performance.[2] After hearing argument, the district court granted summary judgment for the defendants. The court held that no such warranty had been given as a matter of law. Chestnut Forks appeals.
 
 II.
 
 6
 The original written contract for the sale and installation of the truss system was executed on June 20, 1974. It is a simple two-page form, with specifics on the front and general terms and conditions on the back of a single sheet of paper. It was prepared and furnished by Trus Joist. This contract called for 78 trusses at a cost of $48,571. Maloney alleges that he called Trus Joist headquarters before executing this contract and spoke with someone whose name he can no longer remember. The representative told him that the wood truss system would last as long as a metal system.
 
 
 7
 Chestnut Forks then learned that it could get a lower fire insurance rate if the wood in the trusses were treated with a fire retardant. It requested Trus Joist to add such treatment to the contract, and, on July 12, 1974, a new agreement was signed on the same form as the first. This one called for 78 treated trusses at a cost of $61,350.
 
 
 8
 At Trus Joist's instance, a third superseding contract was signed on September 4, 1974. This one added a 79th truss and increased the cost to $62,137. Before signing, Maloney called Trus Joist and again spoke to someone whose name he does not remember. He was told that the extra beam was needed to compensate for the fire retardant. This revelation prompted concern from Maloney, but the representative assured him that the truss system would be as strong as metal and would last a lifetime.
 
 
 9
 The agreement contained express warranties that the truss system would be free of errors in design or workmanship, and Virginia law would imply others. All of these warranties have, however, long since expired. See footnote 2 supra. The agreement also contained boiler-plate clauses declaring that the contract was complete in itself, there were no parol terms, and no subsequent modifications were valid unless made in writing and signed by Trus Joist.
 
 
 10
 Chestnut Forks was hoping to have its grand opening before Christmas, 1974, but the trusses were two weeks late in arriving at the construction site. Work began on a Friday in early November. Over the weekend, the partially completed system collapsed, causing damage to already-constructed walls. Eight joists were also damaged.
 
 
 11
 This accident and the resulting damage were arguably a breach of contract, and Maloney was angry enough to threaten to deny Trus Joist an opportunity to cure. After several meetings, it was agreed that Trus Joist would furnish the eight replacement joists needed and credit $26,484 (approximately 40%) toward the contract price to defray the damages caused to Chestnut Forks by the delay in shipment and the accident. A letter, dated December 12, 1974, from Trus Joist to Maloney reflected this agreement. The letter stated that replacement parts would "carry the full Trus Joist warranty."[3] According to Maloney, there was a bit more to the deal than the letter reflects. He testified that he was very upset after the collapse of the partially completed structure, that he was ready to walk away from the deal, and that he threatened to do so. He alleges that William Walters, Trus Joist's National Manufacturing Manager, again assured him that the completed structure would be as strong as steel. "He absolutely guaranteed this product to a point where I decided to accept his deal. He again expressly told me that that product would last from 80 to 100 years without question." Relying on these assurances, Maloney says that he accepted the offered $26,484 credit. From there, construction went smoothly, and the club was opened in April. Nothing of consequence occurred thereafter until the visit of Trus Joist's engineers in 1992.
 
 III.
 
 12
 A threshold issue is whether the statements allegedly made by the unidentified Trus Joist employees and then by Walters constitute express warranties. The Virginia version of the Uniform Commercial Code states: "any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to that description." Va.Code Sec. 8.2-313(1)(b). The seller may create a warranty without having the specific intent to do so, and he need not use words like "warrant" or "guarantee," but "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Va.Code Sec. 8.2-313(2).
 
 
 13
 There is certainly some tension between the idea that a "description" of the goods creates a warranty but an "opinion" about or "commendation" of them does not. In Virginia, the onus is on the seller to avoid making a warranty:
 
 
 14
 [I]f one who has superior knowledge makes a statement about the goods sold and does not qualify the statement as his opinion, the statement will be treated as a statement of fact.
 
 
 15
 Daughtrey v. Ashe, 243 Va. 73, 413 S.E.2d 336, 338 (1992).
 
 
 16
 The Daughtrey rule squarely resolves this issue. Maloney testified that he was told that the wood truss system would last 80 to 100 years. Because the alleged statements were not qualified as mere opinions, they can constitute "warranties" if they were the basis of the bargain.
 
 IV.
 
 17
 To decide whether the alleged representations formed the basis of the bargain, we must divide them into two groups: (i) statements by unidentified (and now probably unidentifiable) Trus Joist employees made before the September 4 contract, and (ii) Walters' statements to Maloney in connection with the December 12 resolution of Trus Joist's breach of contract.
 
 A.
 
 18
 The September 4 contract contains a merger clause and "no oral modifications" clause:
 
 
 19
 9. Seller and Purchaser mutually agree that the written and printed provisions hereto embody all of the parties' agreements, conditions, and representations; and no oral or written agreements, between the parties or their agents not herein contained shall be of any effect. Subsequent modifications must be in writing and accepted by Seller.
 
 
 20
 In Virginia as elsewhere, evidence of a prior or contemporaneous parol agreement may not be relied upon to contradict the provisions of a written contract. Va.Code Sec. 8.2-202; Walker & Laberge Co. v. First Nat'l Bank of Boston, 206 Va. 683, 146 S.E.2d 239, 243 (1966). However, evidence of additional, consistent terms may be offered, so long as the written contract is not intended to be a "complete and exclusive statement of the terms of the agreement." Va.Code Sec. 8.2-202(b); Shockey v. Westcott, 189 Va. 381, 53 S.E.2d 17, 20 (1949). This exception cannot apply to the assurances allegedly made by Trus Joist employees before execution of the September 4 written contract, because that writing specifies that it contains all of the parties' "agreements, conditions, and representations." The pre-contract oral assurances are therefore unenforceable. Hoover Universal, Inc. v. Brockway Imco, Inc., 809 F.2d 1039, 1043 (4th Cir.1987) (under Virginia law, written handout describing specifications of machine did not create enforceable warranty because of subsequent written sales contract containing merger clause).
 
 B.
 
 21
 Chestnut Forks fares better on the later Walters statements. The delay in delivery and the collapse of the structure gave Chestnut Forks claims for money damages and a colorable right to refuse further performance by Trus Joist and go elsewhere. Maloney and Walters negotiated a settlement, and that settlement included, according to Maloney, Walters' guarantee that the truss system would last 80 to 100 years.
 
 
 22
 There is no doubt that this settlement ("accord and satisfaction")[4] occurred, though there is some question--a jury question--about its terms. As we noted above, Walters wrote a letter to Maloney dated December 12, 1974. Maloney did not remember the letter at his deposition, and Trus Joist could not locate its copy either. The extant copy was discovered in the files of the architect who worked on the project. This copy is signed by Walters but not by Maloney; we can assume, though, because he now relies on it, that Maloney either signed the letter or assented by accepting performance in accordance with it. It does not contain a merger clause, so a consistent additional term--e.g. the 80-100 year guarantee--is not barred by the parol evidence rule.
 
 
 23
 Trus Joist belittles this letter as a mere "credit memo"--whatever that is--but, informality aside, it is a written contract, reciting consideration ("for marketing considerations and to prevent litigation") and containing a full release of Chestnut Forks' claims for breach of contract to date. The letter contract not only contains no merger clause, but it actually refers to "our conversation Monday," which raises at least the spectre that there may be additional terms.
 
 
 24
 In sum, there was a settlement of disputed claims for breach of contract, but whether Walters' guarantee of the future performance of the truss system was a basis of that bargain is a material issue of fact incapable of resolution on summary judgment.
 
 V.
 
 25
 Trus Joist's last fallback is that the December "credit memo"/settlement was a modification of the September 4 agreement, and therefore the earlier agreement's prohibition of oral modifications precludes Chestnut Forks from offering proof of the alleged Walters guarantee.
 
 
 26
 We may assume for sake of argument--though the assumption is tenuous[5]--that this accord and satisfaction, resolving a disputed claim for breach of contract, is a "modification" of the breached contract and not a new, freestanding one. Trus Joist still loses. Under Va.Code Sec. 8.2-209(2), if a contract for the sale of goods is prepared by a "merchant"-seller, a clause in it that purports to preclude oral modifications is enforceable only if (i) buyer is also a "merchant" or (2) the buyer separately executes both the whole contract and the no-modifications clause.
 
 
 27
 Here, Trus Joist concedes that Chestnut Forks is not a "merchant" and that Maloney did not sign the no-modifications clause. Nevertheless, it argues that he is equal to a "merchant" because he received legal advice at the time and had actual knowledge of the clause. It continues that, in light of the general policy that the Uniform Commercial Code should be liberally construed to effect its purposes, we should hold Maloney to the "merchant" standard.
 
 
 28
 Maloney admitted at his deposition that he read the contract. Trus Joist argues that he therefore had actual knowledge of the clause and that his knowledge fully serves the purpose of the separate signing rule. The cases it cites for this proposition, though, do not involve U.C.C. Sec. 2-209(2),[6] but rather whether a disclaimer of warranties under U.C.C. Sec. 2-316(2) is "conspicuous." Several courts have reasoned that the purpose of a conspicuousness requirement is to provide fair notice, and a party with actual notice of the disclaimer has all that the code requires. E.g., Twin Disc, Inc. v. Big Bud Tractor, Inc., 772 F.2d 1329, 1335 n. 3 (7th Cir.1985), and cases cited therein. Here, though actual notice of the no-oral-modifications clause is one purpose of the separate signing requirement, it cannot be the sole purpose, else the code would simply require, a la 2-316(2), that the clause be "conspicuous." We think that the drafters of the code saw a potential for abuse of the unsophisticated by merchants and their form contracts, and it included the separate signing provision to force the merchant to ask for and obtain the actual, specific assent of the non-merchant to the clause.
 
 
 29
 We are likewise not persuaded that Maloney's receipt of legal advice should deprive him of the protection of Sec. 8.2-209(2). A good lawyer might well have advised him not to worry about the clause because it was unenforceable.
 
 
 30
 At bottom, Trus Joist does not ask us to construe Sec. 8.2-209(2); it asks us to ignore it. "Merchant" is a term of art clearly defined by the code,[7] and Chestnut Forks is not a "merchant." There is nothing to construe.
 
 VI.
 
 31
 Trus Joist reminds us time and again that two decades have passed since the alleged oral promise, and permitting plaintiffs to bring suits on unwritten promises so long after the fact risks encouraging fraud. We are not unmindful of this risk, but we think that juries, rather than locked courthouse doors, are the best and fairest way to meet it. The plaintiff must still prove his case, and we trust juries to reject fanciful claims[8] of warranty. The states are certainly free to expand their statutes of fraud to prohibit or limit action on oral warranties, but Virginia has not done so to date. Accordingly, we cannot afford the alleged oral warranty here any less dignity than a written one.
 
 
 32
 The judgment of the district court is reversed, and the case is remanded for further proceedings.
 
 REVERSED AND REMANDED
 CHAPMAN, Senior Circuit Judge, dissenting:
 
 33
 I respectfully dissent. If it is indeed true that the letter from Walters to Maloney dated December 12, 1974 constituted a new, separate contract between Trus Joist and Chestnut Forks, then the district court's grant of summary judgment should be affirmed because the letter contained a release. The letter stated: "Acceptance of this credit releases TRUS JOIST Corporation in full for all claims present or future, resulting out of the incidents described above or arising out of any other aspect of our contractual relationship to date with respect to the Chestnut Forks Tennis Club job." Because Chestnut Forks accepted the credit, Trus Joist was released from liability on all future claims, including this one.
 
 
 
 [1]
 T.J. International, Inc., is the general partner of Trus Joist MacMillan, Ltd. We will refer to them collectively as "Trus Joist" in the remainder of this opinion
 
 
 [2]
 Virginia has a four-year statute of limitations for breaches of warranty, and a cause of action for breach arises at the date of delivery of the nonconforming goods, with no tolling for discovery of defects. Va.Code Sec. 8.2-725(2). Hence, Chestnut Forks' strongest claims expired in 1978-1979. The only exception is where the seller guarantees the goods against defects (the "warranty of future performance") for a specified time, in which case an action may be brought within four years of discovery of the defect (or when discovery should reasonably have occurred). Id
 
 
 [3]
 This letter, on Trus Joist letterhead and addressed to Maloney, reads as follows:
 After reviewing your requests, TRUS JOIST Corporation will grant a credit memo for the expenses shown below incurred from late deliveries and the falldown during erection. There were apparent misunderstandings about delivery schedules which caused approximately two weeks delay. Also two weeks delay resulted from the falldown during erection. TRUS JOIST Corporation offers this credit for marketing considerations and to prevent litigation. From our conversation Monday, it is my understanding this is an acceptable proposal.
 [Detail of $26,424.96 credit omitted]
 In addition, TRUS JOIST Corporation will furnish the eight replacement joists required and continue to provide our services as required. All products carry the full TRUS JOIST warranty.
 Acceptance of this credit releases TRUS JOIST Corporation in full for all claims present or future, resulting out of the incidents described above or arising out of any other aspect of our contractual relationship to date with respect to the Chestnut Forks Tennis Club job. It is understood [illegible] these sums are given as a settlement of the disputed claims and are not to be construed [illegible] an admission of liability.
 Please sign and return one copy of this agreement with the payment for the balance of the account.
 The only extant copy of this agreement is signed by William R. Walters for Trus Joist but is not signed by Maloney.
 
 
 [4]
 The Virginia Supreme Court has defined "accord and satisfaction" as "the offer and acceptance of an agreement in settlement of a disputed claim." Kelly v. R.S. Jones and Associates, Inc., 242 Va. 79, 406 S.E.2d 34, 36 (1991). Its hallmark is that all or part of the consideration cementing the agreement is a release of liability for the disputed claim. The December 12, 1974, letter bears all of the earmarks of an accord and satisfaction
 
 
 [5]
 The Virginia Supreme Court has specifically characterized a settlement as a "new contract" and distinguished it from accepting continued performance after breach under a reservation of rights. John Grier Construction Co. v. Jones Welding & Repair, Inc., 238 Va. 270, 383 S.E.2d 719, 721-722 (1989)
 
 
 [6]
 The only case cited by Trus Joist in which the separate signing requirement of Sec. 2-209(2) was not enforced is Trust Company of Georgia v. Montgomery, 136 Ga.App. 742, 222 S.E.2d 196 (1975). The Montgomery court stated that the signing requirement applied "only to merchants" and that the purchaser's non-merchant status made his reliance on Sec. 2-209(2) "unfounded." This remarkable holding--which is the direct opposite of the statutory terms--is not further explained, and we therefore give Montgomery no weight. On the other hand, a Tennessee court has interpreted Sec. 2-209(2) according to its plain terms. Walker v. Associates Commercial Corp., 673 S.W.2d 517 (Tenn. Ct.App.1983)
 
 
 [7]
 A "merchant" is "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill." Va.Code Sec. 8.2-104(1)
 
 
 [8]
 We do not mean to suggest that summary judgment is never appropriate in this sort of case. A given claim of warranty may be so improbable that the court can conclude that no reasonable trier of fact would credit it, and, of course, summary judgment would then be required. No such holding could be made here, because the alleged representations are quite plausible. The roof truss system, like the foundation, is designed to be a permanent part of a structure. Trusses have supported the roofs of some European cathedrals for hundreds of years. Trus Joist personnel could easily have had enough confidence in their product to warrant it for a mere century